IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 3, 2017

IN RE CATHERINE J.

Appeal from the Juvenile Court for Shelby County
No. CC0587    Harold W. Horne, Special Judge

_____

No. W2017-00491-COA-R3-PT

_____

This is a termination of parental rights case involving the parental rights of the father, Clyde J. ("Father"), to his minor child, Catherine J. ("the Child"). On October 27, 2015, the Shelby County Juvenile Court ("trial court") placed the Child into the custody of the Tennessee Department of Children's Services ("DCS"). The Child was immediately placed in foster care, where she remained at the time of trial. Following a hearing conducted on February 3, 2016, the trial court found the Child to be dependent and neglected as to Father due to improper guardianship. On August 4, 2016, DCS filed a petition to terminate Father's parental rights.[1] Following a bench trial before a special judge on January 26, 2017, the trial court found by clear and convincing evidence that Father had abandoned the Child by failing to visit the Child, failing to financially support the Child, and exhibiting wanton disregard for the Child's welfare prior to his incarceration. The trial court also found clear and convincing evidence that termination of Father's parental rights was in the best interest of the Child. The trial court entered a final judgment on February 13, 2017, terminating Father's parental rights to the Child. Father has appealed. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which RICHARD H. DINKINS, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

James Franklin, Jr., Memphis, Tennessee, for the appellant, Clyde J.

---

[1] The mother, whose parental rights were also terminated by the trial court, is not participating in this appeal. Therefore, we will discuss only those facts relevant to Father.

Herbert H. Slatery, III, Attorney General and Reporter, and Brian A. Pierce, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I. Factual and Procedural Background

The Child was born in July 2015 and remained hospitalized until November 2, 2015 due to heart and thyroid medical conditions. The trial court entered a protective custody order on October 27, 2015, ordering that the Child be placed into the care and custody of the Tennessee Department of Children's Services. The Child was immediately placed into foster care, where she remained at the time of trial. The trial court conducted a preliminary hearing on November 6, 2015, and an adjudicatory hearing on February 3, 2016. The adjudicatory hearing occurred before the Honorable Mitzi Pollard, a magistrate of the Juvenile Court of Memphis and Shelby County. Subsequently, Magistrate Pollard entered "Findings and Recommendations of the Magistrate" on February 3, 2016, which was filed on March 16, 2016, finding by clear and convincing evidence that the Child was dependent and neglected as to Father due to "improper guardianship." On February 19, 2016, Father filed a "Notice of Request for Hearing Before the Judge," which was ultimately denied when Father failed to appear before the trial court on June 27, 2016. Additionally, the trial court confirmed the February 3, 2016 adjudicatory hearing order as the order of the court. Subsequently, DCS filed a petition to terminate Father's parental rights on August 4, 2016. The trial court conducted a bench trial on January 26, 2017, regarding the termination petition with Special Judge Harold W. Horne presiding.

Latoya Greer, the Child's DCS case manager since the Child entered DCS custody, testified at trial. Ms. Greer explained that she provided Father a copy of a document entitled, "Criteria and Procedures for Termination of Parental Rights," on November 6, 2015, while she and Father were present at court for the preliminary hearing in the dependency and neglect action. According to Ms. Greer, after Father read through the document at her request, she presented Father with the option of speaking with his attorney prior to signing the document. Ms. Greer indicated that she explained the contents of the document to Father, which included a definition of and description of the legal consequences of abandonment. Ms. Greer also related that Father had informed her at that time that he had no questions regarding the document and signed it.

Father testified and the trial court found that he was arrested on May 17, 2016. Father's criminal record reflects that Father was incarcerated beginning on July 5, 2016. Father pled guilty to a charge of aggravated burglary on September 14, 2016, and was sentenced to three years of incarceration. Although Father remained incarcerated at the time of trial, he had been granted parole and was scheduled to be released in March 2017.

According to Ms. Greer, she had limited contact with Father throughout her involvement as case manager but had experienced more contact with Father after he became incarcerated.

Ms. Greer testified that the Child had been exposed to multiple drugs at the time of her birth and manifested ongoing special needs. The Child presented a heart condition at birth, which required open-heart surgery, and the Child had a thyroid condition. Because of the Child's health concerns, the Child's physician restricted the Child from leaving the foster home, except for medical appointments, from November 2015 through March 2016. According to Ms. Greer, Father was provided with a list of all medical appointments and invited to attend those appointments. Because of the Child's condition and inability to leave the foster home except for medical appointments, DCS treated Father's projected attendance at those medical appointments as his visits.

Ms. Greer further testified that Father had not visited with the Child since the Child entered DCS custody. According to Ms. Greer, Father contacted her on one occasion, indicating that he would be attending a medical appointment. Father, however, failed to attend the appointment. Ms. Greer stated that Father had never informed her that he had transportation issues or that he was employed during the four months prior to his incarceration. In March 2016, although the Child's physician released her to leave the foster home for purposes other than medical appointments, the Child was still limited in terms of travel. Ms. Greer testified that Father had not attended any medical appointments or visited with the Child since she had been placed into DCS custody. Furthermore, Father had never contacted Ms. Greer to inquire as to the Child's well-being.

Ms. Greer articulated that although the Child maintained no bond with Father, the Child was currently in a pre-adoptive home, enjoyed a strong bond with the foster parents, and was doing "very well." According to Ms. Greer, the Child required twenty-four-hour care at the time of trial, and the foster parents were able to provide such care. She stated that the Child's conditions would require further surgeries and regular "G-tube feedings."[2] Ms. Greer also explained that the Child's care required training, which Father had never completed.

Ms. Greer testified that although Father had not provided any financial support for the Child since the Child had entered DCS custody, if Father had provided gifts to the Child, DCS would have considered them as support for the Child. Concerning the issue, Ms. Greer indicated that while she had requested that Father provide gifts for the Child, he had failed to do so.

---

[2] "G-tube" is a common abbreviation for a gastrostomy tube, which is a tube inserted into the patient's abdomen to deliver nutrition directly to the stomach.

Tiara Martin, a Youth Villages foster care counselor, testified regarding her involvement with the Child. She had been assigned to the case in July 2016. Ms. Martin conducted individual sessions with the Child once a week to address developmental milestones. According to Ms. Martin, she had experienced no contact with Father. Additionally, she did not recount the exact number of medical appointments that the Child attended from January through April 2016 but stated: "It was several."

Father explained that by the time of trial, he had been incarcerated for eight months. Father stated that he was arrested on May 17, 2016, for an aggravated burglary charge stemming from an incident that occurred in August 2015. He admitted not visiting the Child after she was discharged from the hospital following her birth. According to Father, he never received a copy of the Child's medical appointments, and although he had Ms. Greer's phone number, he never requested that Ms. Greer schedule a visit for him with the Child because he thought he could not visit apart from attending medical appointments. Father also indicated that Ms. Greer informed him "about the doctors' appointments" but that she "didn't give [him] the dates." According to Father, notwithstanding that he had asked the foster mother for the dates of the appointments, for which she had provided him two, he did not attend either because he was incarcerated.

It is undisputed that Father signed the Criteria and Procedures for Termination of Parental Rights on November 6, 2015. Father testified that Ms. Greer hurriedly explained the form to him on November 6, 2015, in the hallway of the courthouse prior to the preliminary hearing. He further explained that the area was noisy and busy and that they had barely located a place to sit. According to Father, the explanation was rushed, and he did not leave the meeting with an understanding of the form he had signed. Father reported that he believed he had to sign the form that day or "something would happen."

Father admitted that he did not purchase any items for the Child from April through July 2016, explaining that he was unaware of the process to deliver the items to the Child. According to Father, he did purchase some items for the Child following her birth but never provided those items to DCS or the foster mother. Father did relate that he took clothing to the hospital when the Child was hospitalized following her birth. Regarding expenses, Father testified that he paid approximately $200 to his sister each month for rent and provided her with $50 to $150 each month for the electricity bill. Father also paid approximately $60 each month for his cellular telephone bill. He claimed no additional expenses other than food, hygiene items, and similar items.

Although Father testified that he was present during all court dates in the juvenile court proceedings, he acknowledged that except for the court hearings, he did not follow up with the Child's condition after he lost his phone at the end of 2015. Father indicated that both Ms. Greer's and the foster mother's telephone numbers were listed contacts in

his cellular telephone when it was lost. Father also explained that he did not purchase another telephone, but rather used his sister's telephone as needed.

According to Father, he never received a copy of the December 9, 2015 permanency plan through the mail and was never invited to the meetings to develop the permanency plan. Father offered that he had completed a parenting class and a victim impact class while incarcerated. For proof, he provided corresponding completion certificates to the trial court. Father also provided the trial court with a certificate of baptism.

The foster mother, D. B. ("Foster Mother"), testified that she had been a foster parent with Youth Villages for thirteen years. The Child had been in Foster Mother's home since November 2, 2015, shortly after the Child was placed into DCS custody. Although the Child presented many medical issues, Foster Mother reported that the Child was thriving in her home. Foster Mother expressed her desire, as well as that of her husband, to adopt the Child if that opportunity arose. According to Foster Mother, she had never met with Father but had spoken to him. Foster Mother stated that when she had last spoken with Father on November 3, 2015, for approximately ten or fifteen minutes, she had provided her telephone number to Father, indicating that he was "welcome" to call her. Foster Mother further related that the last time she communicated with Father was in November 2015 through text messaging to inform Father of the dates for the Child's medical appointments. She stated that Father responded to her text message regarding the medical appointments with a message reading, "okay." According to Foster Mother, she provided some dates to Father directly and provided the remaining dates to Ms. Greer, who was to notify Father of the dates. Foster Mother confirmed that the Child had several medical appointments per month that occurred between the hours of 8:00 a.m. to 5:00 p.m.

Foster Mother also indicated that Father never contacted her to inquire about the Child's well-being or to schedule a visit with the Child. Foster Mother described the Child's medical conditions, which included Down syndrome and a thyroid issue. According to Foster Mother, the Child had also undergone surgery to repair her atrioventricular canal and required a G-tube for feedings. The Child wore necessary foot braces because of her left hip condition, with further surgery expected. Foster Mother also explained that although the Child experienced problems with the movement of her eyes, the physicians were unsure whether surgery would be required. The Child also had undergone tube placement into her ears.

According to Foster Mother, the Child was eighteen months old at the time of trial, developmentally delayed, and functioning on the level of an eight-month-old child. Although the Child had not begun walking and had only begun sitting approximately three months prior to trial, she had recently demonstrated the ability to pull herself up to

stand and was "cruising some." The Child had been teething, and her teeth had "come in really rigid and sharp," requiring regular dental appointments. The Child could speak only a few words. Although she continued to require feedings though the respective tube, the Child had recently accepted more food by bottle. Foster Mother explained that while she had to complete a training class at LeBonheur Hospital for the G-tube, she had worked for twenty-five years in patient care and was familiar with its use. The Child also was provided services in the foster home through Tennessee Early Intervention System, which included developmental therapy twice per month, physical therapy twice per month, and speech therapy once per week.

Janis Trent, employed by Shelby County Corrections, testified that she was one of Father's counselors while he was incarcerated. She confirmed that Father had recently been granted parole, opining that Father had been a productive inmate and had been rehabilitated to the point of being a productive citizen in the community.

The trial court entered a final judgment on February 13, 2017, terminating Father's parental rights to the Child. The court found by clear and convincing evidence that Father (1) had abandoned the Child by willfully failing to support her during the four months immediately preceding his incarceration, (2) had abandoned the Child by willfully failing to visit her in the four months immediately preceding his incarceration, and (3) had engaged in conduct prior to his incarceration that exhibited a wanton disregard for the welfare of the Child. The trial court further found by clear and convincing evidence that termination of Father's parental rights was in the best interest of the Child.

Father filed a premature notice of appeal on February 7, 2017, which this Court considered to have been timely filed upon entry of the February 13, 2017 judgment. *See* Tenn. R. App. P. 4(d) ("A prematurely filed notice of appeal shall be treated as filed after the entry of the judgment from which the appeal is taken and on the day thereof."). Although Father did not personally sign the notice of appeal, the notice was signed by Father's trial attorney. Subsequently, Father filed an amended notice of appeal containing his signature on April 7, 2017. Relying on *In re Gabrielle W.*, No. E2016-02064-COA-R3-PT, 2017 WL 2954684 (Tenn. Ct. App. Apr. 20, 2017), this Court dismissed Father's appeal in an opinion filed July 24, 2017, upon a determination that this Court lacked jurisdiction to consider the appeal pursuant to Tennessee Code Annotated § 36-1-124(d).

Father filed with the Tennessee Supreme Court an application for permission to appeal pursuant to Tennessee Rule of Appellate Procedure 11. While Father's application was pending, our Supreme Court conclusively resolved this issue in the case of *In re Bentley D.*, ___ S.W.3d ___, ___, No. E2016-02299-SC-RDO-PT, 2017 WL 5623577, at *5 (Tenn. Nov. 22, 2017). In *Bentley*, the High Court determined that

- 6 -

Tennessee Code Annotated § 36-1-124(d) (2017) did not require that a notice of appeal in a termination case be signed personally by the appellant. *See id.* On November 30, 2017, the Supreme Court remanded the appeal to this Court for a decision on the merits.

## II. Issues Presented

Father presents three issues for our review, which we have restated as follows:

1. Whether Father was provided with sufficient notice of the definition and consequences of abandonment pursuant to Tennessee Code Annotated § 37-2-403(a)(2).

2. Whether Father's failure to visit and support the Child during the statutorily determinative period was willful.

3. Whether Father's actions prior to incarceration demonstrated a wanton disregard for the welfare of the Child.

DCS has raised one additional issue on appeal, which we have similarly restated as follows:

4. Whether Tennessee Code Annotated § 36-1-124(d) requires the signature of Father on the notice of appeal.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *see In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not

absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has recently explained:

> The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decison terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

> * * *

> In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

## IV. Authority of Special Judge

As a threshold issue, we first address, *sua sponte*, whether the special judge, Harold W. Horne, was properly appointed to adjudicate this matter. *See* Tenn. R. App. P. 13(b); *see, e.g., Cty. of Shelby v. City of Memphis*, 365 S.W.2d 291, 291 (Tenn. 1963). If Mr. Horne were not properly appointed as a special judge, we must then determine whether the finality and validity of the trial court's judgment are affected. Father did not raise this as an issue in his appellate brief, and the final order in this matter states: "No party objected to the Special Judge presiding over this matter." Upon our careful review and because Father has acquiesced in the appointment of Mr. Horne as a special judge in this matter, we conclude that Mr. Horne acted as a *de facto* judge in these proceedings and that the judgment signed by Mr. Horne is valid and enforceable.

In the trial court's judgment, signed by Mr. Horne, apparent boilerplate language[3] was included, which reads as follows:

> The Judge of the Juvenile Court of Memphis and Shelby County, Tennessee finds it necessary to be absent from holding Court, and pursuant to Tennessee Code Annotated § 17-2-122(b) appoints a substitute Special Judge, Harold W. Horne, who is a licensed attorney in good standing with the Tennessee Supreme Court and a Magistrate appointed by him to serve as a special judge in matters related to duties as a judicial officer.[4]

---

[3] The same language, except for the special judge's name, appears in at least three separate orders in the record signed by special judges.

[4] Tennessee Code Annotated § 17-2-122 (2009) provides:

> (a)      Notwithstanding § 16-15-209 or § 17-2-109 or any other relevant provision to the contrary, a judge shall have the authority to appoint a special judge as provided in this section.
>
> (b)      Sections 16-15-209 and 17-2-109 and any other relevant provision shall not apply where a judge finds it necessary to be absent from holding court and appoints as a substitute judge an officer of the judicial system under the judge's supervision whose duty it is to perform judicial functions, such as a juvenile magistrate, a child support magistrate or clerk and master, who is a licensed attorney in good standing with the Tennessee supreme court. The judicial officer

- 9 -

The record before us contains no order signed by the trial court judge appointing Mr. Horne as a special judge in this action.[5] Instead, the judgment bears only Mr. Horne's signature for appointment as special judge. Notwithstanding, neither party has challenged the special judge's authority to adjudicate the termination action either in the trial court or on appeal.

Although the absence of an appointment order is a procedural error, the procedural error is not necessarily fatal. *See Ferrell v. Cigna Prop. & Cas. Ins. Co.*, 33 S.W.3d 731, 739 (Tenn. 2000); *State Dep't of Children's Servs. v. A.M.H.*, 198 S.W.3d 757, 764 (Tenn. Ct. App. 2006); *In re M.A.P.*, No. W2008-01352-COA-R3-PT, 2009 WL 2003357, at *13, n.11 (Tenn. Ct. App. July 10, 2009). If a judge is acting under the color of law absent bad faith, the special judge may serve as a *de facto* judge, and his or her acts will be binding on the parties. *See Ferrell*, 33 S.W.3d at 739; *M.A.P.*, 2009 WL 2003357, at *13, n.11. Our Supreme Court explained: "A judge *de facto* is one acting with color of right and who is regarded as, and has the reputation of, exercising the judicial function he assumes." *Ferrell*, 33 S.W.3d at 739 (quoting *State ex rel. Newsom v. Biggars*, 911 S.W.2d 715, 718 (Tenn. 1995)).

This Court recently addressed a similar issue in *In re Devin B.*, No. W2016-00121-COA-R3-JV, 2016 WL 4520859, at *3 (Tenn. Ct. App. Aug. 25, 2016), *perm. app. denied* (Tenn. Dec. 15, 2016), explaining in relevant part:

> Relying on *In re M.A.P.*, Father notes that the special judge's "authority was not challenged by any of the parties, and there is nothing in the record indicating that [the special judge] operated in bad faith, and therefore, [the special judge] acted as de facto judge, and the appeal is properly before this [c]ourt." Despite this Court's criticism of the Juvenile Court's method of appointing special judges in 2009 in *In re M.A.P.*, the practice appears to have endured. However, given Father's acquiescence to the practice and the outcome discussed herein, we proceed to address the issues raised by Appellant on appeal.

---

shall only serve as special judge in matters related to their duties as judicial officer.

[5] Although the record is otherwise silent as to whether Mr. Horne is a magistrate or other judicial officer, Mr. Horne is listed as a juvenile magistrate on the website maintained by the Tennessee Administrative Office of the Courts, located at http://www.tncourts.gov. We take judicial notice of this listing. *See* Tenn. R. Evid. 201(b)(2). However, because the record contains no order signed by the trial court judge appointing Mr. Horne as a special judge, Mr. Horne's status as a magistrate does not affect our analysis in the instant action.

*See also State ex rel. Williams v. Woods*, 530 S.W.3d 129, 137-39 (Tenn. Ct. App. 2017), *perm. app. denied* (Tenn. Aug. 21, 2017).

Similarly, in the case at bar, Father has acquiesced in the appointment of Mr. Horne as a special judge. Despite the absence of an appointment order signed by the trial court judge, the record contains no evidence that the special judge operated in bad faith. Inasmuch as there has been no objection by any party to Mr. Horne's authority to preside over this matter in the absence of a valid appointment order, we determine that the special judge was acting as a *de facto* judge. Accordingly, the judgment is final and valid. We shall proceed to address the issues raised on appeal.

### V. Tennessee Code Annotated § 36-1-124(d)

DCS also raises the issue of whether Tennessee Code Annotated § 36-1-124(d) operates to require the signature of Father on the notice of appeal to confer jurisdiction on this Court. This matter was previously dismissed by this Court for lack of jurisdiction because Father failed to personally sign the timely notice of appeal. Following that decision, our Supreme Court conclusively resolved this issue in *In re Bentley D.*, ___ S.W.3d at ___, 2017 WL 5623577, at *5. In *Bentley*, the High Court determined that Tennessee Code Annotated § 36-1-124(d) does not require that a notice of appeal in a termination case be signed personally by the appellant. *See id.* The Court explained:

> Because section 36-1-124(d) does not require the appellant to sign "personally" the notice of appeal and does not distinguish the appellant from his or her attorney, we conclude that the word "appellant" includes an attorney specifically authorized to file a notice of appeal on the appellant's behalf. We emphasize that no appeal should be taken in a termination of parental rights proceeding without specific authorization from the client. Construing the signature requirement of section 36-1-124(d) to require specific authorization for a notice of appeal signed by an appellant's attorney strikes the appropriate balance between protecting the fundamental rights of parents and acting in the best interests of children. See In re Carrington H., 483 S.W.3d at 533 ("Due process unquestionably requires States to provide parents with fundamentally fair procedures, but it does not require States to ignore the other interests at stake in parental termination proceedings.").

*Id*. (footnote omitted). Therefore, the *Bentley* Court determined that the appeal was not subject to dismissal simply because the appellant's timely notice of appeal was signed by the appellant's attorney rather than by the appellant personally. *Id*.

Based on the Supreme Court's statutory construction of Tennessee Code Annotated § 36-1-124(d) and instruction in *Bentley*, we likewise conclude that Father's appeal in this matter is not subject to dismissal simply because Father's timely notice of appeal was signed by Father's attorney rather than by Father personally. Accordingly, we will proceed to analyze Father's issues on the merits.

## VI. Statutory Abandonment by Incarcerated Parent

Tennessee Code Annotated § 36-1-113 (2017) lists the statutory grounds for termination of parental rights, providing in relevant part:

(a)    The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c)    Termination of parental or guardianship rights must be based upon:

    (1)    A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

    (2)    That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court terminated Father's parental rights upon statutory grounds that he abandoned the Child. Tennessee Code Annotated § 36-1-113(g)(1) provides in relevant part:

(g)    Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

    (1)    Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

- 12 -

In the case at bar, Father was arrested on May 17, 2016. Because Father remained incarcerated at the time the petition was filed to terminate his parental rights, the definition of abandonment contained within Tennessee Code Annotated § 36-1-102(1)(A)(iv) (2017) applies. This subdivision provides in pertinent part:

> (iv)    A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Pursuant to this definition, the determinative period applicable to the grounds of willful failure to support and willful failure to visit began four months immediately preceding Father's arrest on May 17, 2016. The relevant four-month period therefore spanned January 17, 2015, through May 16, 2016. *See In re D.H.B.,* No. E2014-00063-COA-R3-PT, 2015 WL 1870303, at *8 (Tenn. Ct. App. Apr. 23, 2015) (interpreting the four-month period "immediately preceding" the parent's incarceration as ending on the day before the actual date of incarceration). We note that a parent's actions demonstrating wanton disregard for the welfare of a child are not restricted to only the four-month period prior to incarceration. *See In re Audrey S.,* 182 S.W.3d at 871.

Father raises four issues for review concerning the statutory ground of abandonment, including whether (1) Father was provided sufficient notice pursuant to Tennessee Code Annotated § 37-2-403(a)(2), (2) Father's failure to visit the Child was willful, (3) Father's failure to financially support the Child was willful, and (4) Father's actions constituted a wanton disregard for the Child's welfare. We will address each of these issues in turn.

### A. Notice to Father of Consequences and Definition of Abandonment

Father contends that DCS failed to provide him with notice of the statutory definition of abandonment or the consequences of such abandonment pursuant to Tennessee Code Annotated § 37-2-403(a)(2) (2014). Specifically, Father asserts that he did not fully understand the "Criteria and Procedures for Termination of Parental Rights" form when it was explained to him. Upon a careful review of the record, we determine

that Father was afforded sufficient notice of the statutory definition and consequences of abandonment.

As a prerequisite to terminating parental rights based on the ground of abandonment by failing to visit or support the child, DCS must provide a parent with notice pursuant to Tennessee Code Annotated § 37-2-403(a)(2), which provides:

(A)     The permanency plan for any child in foster care shall include a statement of responsibilities between the parents, the agency and the caseworker of such agency. Such statements shall include the responsibilities of each party in specific terms and shall be reasonably related to the achievement of the goal specified in subdivision (a)(1). The statement shall include the definitions of "abandonment" and "abandonment of an infant" contained in § 36-1-102 and the criteria and procedures for termination of parental rights. Each party shall sign the statement and be given a copy of it. The court must review the proposed plan, make any necessary modifications and ratify or approve the plan within sixty (60) days of the foster care placement. The department of children's services shall, by rules promulgated pursuant to the Uniform Administrative Procedures Act, compiled in title 4, chapter 5, part 2, determine the required elements or contents of the permanency plan.

(B)(i)  The parents or legal guardians of the child shall receive notice to appear at the court review of the permanency plan and the court shall explain on the record the law relating to abandonment contained in § 36-1-102, and shall explain that the consequences of failure to visit or support the child will be termination of the parents' or guardians' rights to the child, and the court will further explain that the parents or guardians may seek an attorney to represent the parents or guardians in any termination proceeding. If the parents or legal guardians are not at the hearing to review the permanency plan, the court shall explain to the parents or guardians at any subsequent hearing regarding the child held thereafter, that the consequences of failure to visit or support the child will be termination of the parents' or guardians' rights to the child and that they may seek an attorney to represent the parents or guardians in a termination proceeding.

(ii)    If the parents or guardians of the child cannot be given notice to appear at the court review of the permanency plan, or if they refuse or fail to appear at the court review of the permanency plan, or

- 14 -

cannot be found to provide notice for the court review of the permanency plan, any agency that holds custody of the child in foster care or in any other type of care and that seeks to terminate parental or guardian rights based upon abandonment of that child under § 36-1-102, shall not be precluded from proceeding with the termination based upon the grounds of abandonment, if the agency demonstrates at the time of the termination proceeding:

(a) That the court record shows, or the petitioning party presents to the court a copy of the permanency plan that shows that the defendant parents or legal guardians, subsequent to the court review in subdivision (a)(2)(B)(i), has signed the portion of the permanency plan that describes the criteria for establishing abandonment under § 36-1-102, or that the court record shows that, at a subsequent hearing regarding the child, the court made the statements to the parents or legal guardians required by subdivision (a)(2)(B)(i);

(b) By an affidavit, that the child's permanency plan containing language that describes the criteria for establishing abandonment under § 36-1-102 was presented by the agency party to the parents or guardians at any time prior to filing the termination petition, or that there was an attempt at any time to present the plan that describes the criteria for establishing abandonment under § 36-1-102 to the parents or guardians at any time by the agency party, and that such attempt was refused by the parents or guardians; and

(c) That, if the court record does not contain a signed copy of the permanency plan, or if the petitioning agency cannot present evidence of a permanency plan showing evidence of such notice having been given or an affidavit showing that the plan was given or that the plan was attempted to be given to the parents or guardians by the agency and was refused by the parents or guardians, and, in this circumstance, if there is no other court record of the explanation by the court of the consequences of abandonment and the right to seek an attorney at any time, then the petitioning agency shall file with the court an affidavit in the termination proceeding that describes in detail the party's diligent efforts to bring such notice required by subdivision (a)(2)(B)(i) to such parent or

> guardian at any time prior to filing the agency's filing of the termination petition.

(Emphasis added.)

As this Court has explained regarding the notice requirement in Tennessee Code Annotated § 37-2-403(a)(2):

> Tenn. Code Ann. § 37-2-403 requires that a permanency plan be prepared within 30 days of a child's initial placement into foster care; the plan is to be approved by the court supervising the placement. The plan "shall include the definitions of 'abandonment' and 'abandonment of an infant' contained in Tenn. Code Ann. § 36-1-102 and the criteria and procedures for termination of parental rights." Tenn. Code Ann. § 37-2-403(a)(2)(A). When the plan is presented to the court for approval, the parents or guardians are given notice to appear and the court is obliged to "explain on the record the law relating to abandonment contained at § 36-1-102, and that the consequences of failure to visit or support the child will be termination of parents' . . . rights to the child . . . ." Tenn. Code Ann. § 37-2-403(a)(2)(B)(i). If the parents are not present at the first hearing, the court is required to make the required explanation at any subsequent hearing. *Id.*

*In re Josie A.*, No. M2014-00442-COA-R3-PT, 2014 WL 7069926, at *3 (Tenn. Ct. App. Dec. 12, 2014).

Regarding the notice requirement in the case at bar, the trial court found as follows:

> As required by Tennessee Code Annotated (T.C.A.) § 36-1-113(k), the Court makes the following findings of fact by clear and convincing evidence based on witness testimony, trial exhibits, statements of counsel and the entire record in this cause.

> * * *

> Ms. Greer advised the father on November 6, 2015 that willful failure to visit or contribute to the support of the child was a ground for termination of parental rights. [Father] signed the Criteria and Procedures for Termination of Parental Rights on that date.

- 16 -

\* \* \*

**Notice Pursuant to T.C.A. § 37-2-403(a)(2)(B)**: Family Service Worker Ms. Greer testified that she went over the Criteria and Procedures for Termination of Parental Rights with [Father] prior to a preliminary hearing on November 6, 2015. According to Ms. Greer, [Father] did not have any questions about the document after she went over its contents with him while they were sitting in the Shelby County Juvenile Court hallway, and [Father] voluntarily signed the document without consulting his attorney. Ms. Greer testified that she gave [Father] the opportunity to go over the document with his court-appointed attorney and provide a signed copy of the document to her at a later date, but [Father] decided to sign the document without having that conversation with his attorney. According to Ms. Greer, [Father] stated to her that he understood the Criteria and did not have any questions. Ms. Greer advised [Father] to meet her at her office after the preliminary hearing so she could provide him a copy of the signed Criteria, but [Father] failed to meet her at the office. In contrast, [Father] testified that he did not really understand the Criteria and felt he had no choice but to sign the document. Ms. Greer invited [Father] to the Initial Permanency Plan Child and Family Team meeting scheduled for December 9, 2015, and [Father] called her that day and informed her he was en route to the meeting. At the meeting, Ms. Greer went over the Criteria and Procedures for Termination of Parental Rights with [Mother], and [Ms. Greer] testified she would have gone over the document with [Father] again had he ever showed up to the meeting. However, [Father] did not appear at the meeting despite receiving notice (which was mailed to . . . ) and confirming via telephone that he knew a meeting was being held and he would arrive shortly. However, [Father] testified that he did not recall being invited to the meeting on that date. In addition, Ms. Greer testified that [Father] appeared late for the initial ratification hearing on January 4, 2016, and he missed an opportunity for the Juvenile Court Magistrate to explain the Criteria to him on the record. In contrast, [Father] testified that he did not recall attending any hearing or attempting to attend any hearing on January 4, 2016.

It is undisputed that DCS provided Father with a copy of the "Criteria and Procedures for Termination of Parental Rights," which Father signed on November 6, 2015. Father argues that the location where Ms. Greer provided Father with the form and explained the consequences of abandonment was distracting to the point of rendering his notice insufficient insofar as he did not understand that if he failed to visit or support the Child, his parental rights could be terminated. It is undisputed that Father and Ms. Greer met in the hallway outside the courtroom prior to the preliminary hearing in the

- 17 -

dependency and neglect action, where she provided him with and explained to him the "Criteria and Procedures for Termination of Parental Rights." According to Ms. Greer's testimony, Father and she were in the hallway for "almost an hour," and Father "had opportunity to read every document that [she] gave him."

We determine that Father acknowledged that DCS had explained to him the "Criteria and Procedures for Termination of Parental Rights" by signing his name after a line reading: "**I have received a copy of <u>Criteria & Procedures for Termination of Parental Rights</u> and have been given an explanation of its contents.**" On the same document, the case manager signed, acknowledging as follows: "I explained the contents of this document to the father on: 11/6/15." Father now claims that the "circumstances under which the form was signed were questionable." Father testified that he and Ms. Greer went through the form "in a hurry" and that "[i]t wasn't like, you know, sit down and go over this and this is what this is and this is what happens if this don't happen, but it was kind of was like a rush thing to me it felt like." According to Father, he did not understand the consequences of his failure to visit and support the Child. However, it is undisputed that on the date of signing, Father did not indicate to Ms. Greer that he did not understand the content of the document he signed.

We note that this Court has previously determined that the form typically utilized by DCS as "Criteria and Procedures for Termination of Parental Rights" contains a statutory definition of abandonment as a ground for termination of parental rights. *See, e.g., In re Timothy W.H.,* No. M2012-01638-COA-R3-PT, 2012 WL 6115061, at *3 (Tenn. Ct. App. Dec. 7, 2012) ("The criteria [for termination of parental rights] addressed abandonment, lack of concern, substantial noncompliance with the permanency plan, and persistent conditions."); *In re Ashley E.,* No. M2011-02473-COA-R3-PT, 2012 WL 3027352, at *3 (Tenn. Ct. App. June 8, 2012) (finding that the "criteria and procedures for termination of parental rights" that the parents acknowledged they received in the mail from DCS was "the notice referenced at Tenn. Code Ann. § 37-2-403(a)(2)(A)."); *In re Amber M.S.,* No. M2010-00873-COA-R3-PT, 2010 WL 4941180, at *2 (Tenn. Ct. App. Nov. 30, 2010) ("The package also included a document titled, 'Criteria and Procedures for Termination of Parental Rights,' which explained the criteria and procedures for termination of parental rights and warned Mother of the consequences if she failed to comply with the plans."); *In re C.S., Jr.,* No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *2 (Tenn. Ct. App. Sept. 14, 2006) ("A second permanency plan for the children was established on August 27, 2004. Mother signed this plan, as well as the criteria and procedures for termination of parental rights, which outlined the circumstances under which Mother's parental rights could be terminated.").

In support of his argument, Father relies on this Court's decision in *In re J.L.E.,* No. M2004-02133-COA-R3-PT, 2005 WL 1541862 (Tenn. Ct. App. Feb. 10, 2005) (overruled on other grounds by *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015)). We

determine this case to be highly factually distinguishable from the case at bar. In *In re J.L.E.*, this Court reversed the trial court's finding of abandonment upon determining that the record contained no indication that the mother had participated in development of the first two permanency plans or had received an explanation of the criteria for termination until after the termination petition had been filed. *See In re J.L.E.*, 2005 WL 1541862, at *9 ("Obviously, notifying Mother in February of 2004 that her failure to establish a suitable home by October of 2003 constituted grounds for termination in a petition that had already been filed does not meet the statutory requirement of notice."). Father's reliance on this case is misplaced and unavailing.

Unlike the mother in *In re J.L.E.*, Father was presented with a copy of the criteria, given ample time to read the contents of the form, and provided an explanation of the form. It is undisputed that Father never followed up with Ms. Greer or informed her that he did not understand the document that she had reviewed with him in the hallway. We note that Father signed the form on November 6, 2015, but did not inform DCS or the trial court that he did not understand the document he signed until after the termination petition was filed. Father first asserted that he did not understand the Criteria and Procedures for Termination of Parental Rights form via a motion *in limine* filed by his attorney on January 25, 2017, over a year after he signed the criteria form. Upon our thorough review of the record, we conclude that DCS provided Father with adequate notice of the definition and consequences of abandonment pursuant to Tennessee Code Annotated § 37-2-403(a)(2).

B. Statutory Abandonment Through Willful Failure to Visit and Support the Child

Father does not argue that the trial court erred in determining that he failed to support or visit the Child. Instead, Father contends that the trial court erred by determining his failure to visit or support the Child to be willful. Pursuant to the statute, the court must find that a parent's failure to visit or support was willful. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007). As this Court previously has explained:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. section 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months.

*In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005).

Failure to visit or support a child is willful when a person is "aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *Id.* at 864. This Court has further explained:

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*Id.* Furthermore, "[a] parent cannot be said to have abandoned a child when his failure to visit . . . is due to circumstances outside his control." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). A parent's failure to visit is not excused by someone else's conduct unless the conduct actually prevents the obligated person from visiting or "amounts to a significant restraint of or interference with the parent's efforts to develop a relationship with a child." *Id.* at 863-64. Lastly, any efforts made to visit a child after a petition to terminate parental rights has been filed do not negate or provide repentance for prior abandonment. *See* Tenn. Code Ann. § 36-1-102(1)(F); *In re S.R.M.*, E2008-01359-COA-R3-PT, 2009 WL 837715, at *12 (Tenn. Ct. App. Mar. 27, 2009).

Regarding Father's failure to visit and support the Child, the trial court found:

As required by Tennessee Code Annotated (T.C.A.) § 36-1-113(k), the Court makes the following findings of fact by clear and convincing evidence based on witness testimony, trial exhibits, statements of counsel and the entire record in this cause.

* * *

**Abandonment by Incarcerated Parent for Failure to Visit, Failure to Support, and Wanton Disregard**: Pursuant to T.C.A. § 36-1-113(g)(1) and as defined by T.C.A. § 36-1-102(1)(A)(iv), [Father] has abandoned the child in that he was incarcerated at the time of the petition to terminate parental rights was filed and part of the four (4) months preceding the filing of the petition, and he willfully failed to visit and to contribute to the support of the child for four (4) consecutive months preceding incarceration. [Father] was incarcerated on May 17, 2016 for charges of aggravated burglary, and he remained there past the date the Department filed its petition. In fact, [Father] remained incarcerated at the time of trial but reported he was scheduled for parole on March 1, 2017. Additionally, [Father] has been incarcerated for aggravated burglary, and [Father] engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child by committing the act of aggravated burglary and also failing to provide adequate supervision and support for the child

prior to incarceration. Ms. Greer advised the father on November 6, 2015 that willful failure to visit or contribute to the support of the child was a ground for termination of parental rights. [Father] signed the Criteria and Procedures for Termination of Parental Rights on that date.

a.   **Failure to Visit**: [Father] willfully failed to visit [the Child] at any time in the four (4) months prior to his incarceration, which began on May 17, 2016. Family Service Worker Ms. Greer testified that she provided [Father] with the dates of doctor's appointments for [the Child] that were scheduled between January 17, 2016 and May 16, 2016 through telephone calls, text messages, and mail sent to the address he provided of . . . in Memphis, Tennessee. Ms. Greer testified that the Department considered [the Child's] doctor's visits the father's opportunities to visit because [the Child] was placed on homebound status after having open-heart surgery. Therefore, the only time [the Child] could leave the foster home was for those doctor's appointments until late March 2016. Ms. Greer did not receive any returned mail from those letters sent to [Father] at the . . . address. [Father] denied that he received any of Ms. Greer's letters, but he did confirm that his address was . . . until he moved elsewhere with his sister in April 2016. [Father] further testified that his telephone and wallet were stolen toward the end of 2015, and he did not obtain a new telephone. [Father] saw Ms. Greer at court on February 2, 2016 and had the opportunity to obtain any lost contact information. The Court finds that [Father] knew of the opportunities provided to have contact with [the Child] at her doctor's appointments (which were [Father's] opportunity for visitations), and [Father] failed to attend any visits during the applicable time period of January 17, 2016 to May 16, 2016. The Court further finds that [Father] failed to maintain contact with the Department or even inquire as to the child's condition. [Foster Mother] testified that she sent text messages to [Father] shortly after [the Child] entered foster care and provided him several dates of upcoming doctor's appointments for [the Child] dating between November 2015 and March 2016. According to [Foster Mother], [Father] responded via text message that he received those dates.

b.   **Failure to Support**: [Father] willfully failed to support [the Child] at any time in the four (4) months prior to incarceration, which began on May 17, 2016. The Court finds that [Father] did not provide any child support for the child during the applicable four (4) month time period, or at any time before that period of time.

[Father] testified that during the applicable time period between January 17, 2016 and May 16, 2016, he was employed full-time at Brickstone Staffing. [Father] worked from 5:00 a.m. to 3:00 p.m. five to six days a week during that time period, and he received $9.00 an hour in payment. [Father] went on to testify that he lived with his sister at the . . . address and assisted her with the light bill by contributing $50.00 to $150.00 during some months. [Father] paid his sister $100.00 every two weeks toward the rent she was paying on the house. [Father] stated he had a $60.00 cell phone bill, even though he also testified that his cell phone was stolen at the end of 2015. [Father] testified that his remaining costs included hygiene products, groceries, and sometimes taxi cab fare. When asked if he had provided any child support or in-kind gifts for [the Child], [Father] stated that he did not know where to send any monetary support, and he did not know to whom he could give items for [the Child]. [Father] did state that he had several things, including a bassinet, for [the Child], but these items were not provided to anyone for her benefit.

(Internal citations omitted.) We note that although we review the trial court's findings of fact with a presumption of correctness, the trial court's conclusion that Father's failure to visit and failure to support constituted willful abandonment is a question of law, which we review *de novo* with no presumption of correctness. *See In re Adoption of A.M.H.,* 215 S.W.3d 793, 810 (Tenn. 2007).

## 1. Willful Failure to Visit

According to Ms. Greer, the Child's physician would not allow the Child to leave the foster home except for medical appointments after her discharge from the hospital in November 2015 until March 2016 because of the Child's medical condition. According to Foster Mother, the Child had medical appointments scheduled approximately every other week. Foster Mother testified that she had provided the initial medical appointment dates to Father and that he had confirmed receipt of the text message with the dates. Foster Mother also explained that Ms. Greer provided further medical appointment dates to Father. According to Ms. Greer, she mailed Father the dates of the Child's medical appointments to his home address, where Father confirmed he lived until April 2016. The documents she mailed to Father at that address were not returned to her as undeliverable.

As discussed above, Father testified that his cellular telephone was stolen at the end of 2015, at which time he lost the contact information for Ms. Greer and Foster Mother. However, as the trial court noted, Father was present in court on February 2,

2016, and failed to request contact information from Ms. Greer at that time. Father acknowledged that while he moved in April 2016, he had failed to provide a new address to DCS. The record also reflects that when the Child's physician released the Child in March 2016, Youth Villages staff attempted to reach out to Father to schedule visits, but they were unable to contact him.

Father admitted that although he had transportation issues, he never communicated those concerns to DCS or requested assistance to attend the Child's medical appointments. According to Father, he had no problem obtaining rides from his family to travel to and from work. On appeal, Father claims that he was working from the hours of 5:00 a.m. until 3:00 p.m. and that his work schedule contributed to his inability to attend the Child's medical appointments. However, Ms. Greer indicated that Father had not communicated to her that he was working from January 2016 through May 2016 and had not informed her that he had a conflict with the dates and times of the Child's medical appointments.

Although Father claimed that he did not know the dates and times of the medical appointments, he admitted that Foster Mother had provided some of the dates to him. According to Father, he had not attended those initial visits because he became incarcerated. However, the record reflects that Father was only incarcerated from August 17, 2015, until August 25, 2015, before being released on bond, and the Child was hospitalized during that time. The Child was released from the hospital in November 2015 after Father was released on bond. Father's testimony demonstrated that he was out of jail from August 2015 until May 17, 2016. Therefore, Father's testimony that he was incarcerated at the time of the Child's medical appointments is inconsistent with his testimony that he was incarcerated in August 2015 for approximately two weeks.

Father never appeared for any medical appointments that would have constituted visits with the Child. The record is devoid of any attempts by Father to attend a medical appointment or visit with the Child, except for one occasion when Father informed Ms. Greer that he would attend an appointment but failed to appear for the visit. The record is also lacking evidence that Father attempted to inquire about the dates for the Child's scheduled medical appointments with either Ms. Greer or Foster Mother.

Ms. Greer reported that she had provided Father with notice of all medical appointments for the Child. Although Father insisted that he did not receive notice of the medical appointment dates, the trial court found that Father "knew of the opportunities provided to have contact with [the Child] at her doctor's appointments (which were [Father's] opportunity for visitations), and [Father] failed to attend any visits during the applicable time period of January 17, 2016 to May 16, 2016." Consequently, the trial court found that Father had willfully abandoned the Child by failing to visit her prior to his incarceration. Upon a thorough review of the record, we conclude that the evidence

does not preponderate against the trial court's determination, by clear and convincing evidence, that Father abandoned the Child by willfully failing to visit her during the statutorily determinative period.

## 2. Willful Failure to Support

It is undisputed that Father never provided financially for the Child during the four months prior to his incarceration. Father contends that the trial court erred by finding that his failure to support the Child was willful. *See In re R.L.F.*, 278 S.W.3d 305, 320 (Tenn. Ct. App. 2008) ("'A parent who fails to support a child because he or she is financially unable to do so is not willfully failing to support the child.'") (quoting *In re M.J.M., Jr.*, No. M2004-02377-COA-R3-PT, 2005 WL 873302, at *8 n.17 (Tenn. Ct. App. Apr. 14, 2005)), *overruled on other grounds by In re Kaliyah S.,* 455 S.W.3d 533 (Tenn. 2015). According to Father's testimony, he worked at least nine hours a day, six days per week during the statutorily determinative period. According to Father's testimony, he earned approximately $486 per week or $1,944 per month in gross income. Based on Father's testimony, his living expenses were from $250 to $350 per month, plus expenses for hygiene products, groceries, and sometimes taxi cab fare.[6] Father does not claim that he was unable to afford to pay child support for the Child.

Instead, Father argues that he experienced "some confusion" about when and where to send his child support payments and whether his child support had to be in the form of monetary payments or "'in-kind' support." Ms. Greer testified that she had informed Father that he could provide gifts for the Child in lieu of monetary support. Although Father acknowledged that his confusion resulted in his lack of financial support for the Child, he maintained that it did not constitute willful abandonment of the Child. Father testified that he purchased items shortly after the Child's birth, such as a bassinet, clothing, and bottles. However, Father claims that he did not know where to send the items for the Child. Father acknowledges that he never provided the items to the Child. Ms. Greer testified that Father did not financially support the Child during the four months prior to his incarceration or at all during the pendency of the case. It is undisputed that at no time did Father inform Ms. Greer that he was employed or inquire where to send items for the Child.

It is also undisputed that no court order existed requiring Father to pay child support for the Child. However, it is well settled that a parent is presumed to have knowledge of the parent's legal duty to support the child. *See* Tenn. Code Ann. § 36-1-102(1)(H). Furthermore, a court order is not required to establish a duty to support the

---

[6] The trial court noted that although Father testified regarding his monthly $60 cellular telephone bill, he further testified that he lost the telephone at the end of 2015 and did not purchase another one prior to his incarceration.

Child. *See State, Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 523-24 (Tenn. Ct. App. 2004) ("In Tennessee . . . the obligation to pay support exists even in the absence of a court order to do so."). Father failed to financially support the Child during the four months prior to his incarceration. Father had the means to support the Child and had no justifiable excuse for not providing support. Therefore, we determine that Father's failure to support the Child was willful. *See In re Audrey S.*, 182 S.W.3d at 864 ("Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so."). Upon a thorough review of the record, we conclude that the evidence does not preponderate against the trial court's determination, by clear and convincing evidence, that Father abandoned the Child by willfully failing to support her during the statutorily determinative period.

### C. Abandonment through Wanton Disregard

The trial court further found that Father abandoned the Child by exhibiting wanton disregard for the Child's welfare prior to his incarceration. Tennessee Code Annotated § 36-1-113(g)(4), as relevant to this issue, provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]

Tennessee Code Annotated § 36-1-102(1)(A)(iv) provides in pertinent part:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child . . . .

(Emphasis added.)

A parent's actions constituting wanton disregard for the welfare of a child are not restricted to only the four-month period prior to incarceration. *See In re Audrey S.,* 182 S.W.3d at 871. This Court has consistently held that "probation violations, repeated

- 25 -

incarceration, criminal behavior, substance abuse, and the failure to provide adequate support for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.,* 182 S.W.3d at 867-68; *see also In re K.F.R.T.,* No. E2015-01459-COA-R3-PT, 2016 WL 908926 at *4 (Tenn. Ct. App. Mar. 10, 2016). "Simply stated, a parent's 'poor judgment and bad acts that affect the children constitute a wanton disregard for the welfare of the children.'" *In re T.L.G.*, No. E2014-01752-COA-R3-PT, 2015 WL 3380896, at *3 (Tenn. Ct. App. May 26, 2015) (quoting *State, Dep't of Children's Servs. v. Hood*, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009)).

Regarding its determination that Father had abandoned the Child by engaging in conduct that exhibited a wanton disregard for the Child's welfare prior to Father's incarceration, the trial court found as follows:

> As required by Tennessee Code Annotated (T.C.A.) § 36-1-113(k), the Court makes the following findings of fact by clear and convincing evidence based on witness testimony, trial exhibits, statements of counsel and the entire record in this cause.
>
> * * *
>
> **Abandonment by Incarcerated Parent for Failure to Visit, Failure to Support, and Wanton Disregard**: Pursuant to T.C.A. § 36-1-113(g)(1) and as defined by T.C.A. § 36-1-102(1)(A)(iv), [Father] has abandoned the child in that he was incarcerated at the time of the petition to terminate parental rights was filed and part of the four (4) months preceding the filing of the petition, and he willfully failed to visit and to contribute to the support of the child for four (4) consecutive months preceding incarceration. [Father] was incarcerated on May 17, 2016 for charges of aggravated burglary, and he remained there past the date the Department filed its petition. In fact, [Father] remained incarcerated at the time of trial but reported he was scheduled for parole on March 1, 2017. Additionally, [Father] has been incarcerated for aggravated burglary, and [Father] engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child by committing the act of aggravated burglary and also failing to provide adequate supervision and support for the child prior to incarceration.
>
> * * *
>
> c. **Wanton Disregard**: [Father] engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of [the

- 26 -

Child]. [Father] testified that he became aware of [Mother's] pregnancy with [the Child] when [Mother] was three to four months into her pregnancy. [Father] stated he was initially arrested for aggravated burglary in August 2015, which was after [the Child's] birth. [Father's] criminal behavior that resulted in his arrest for aggravated burglary constitute[s] wanton disregard for [the Child's] welfare. [Father's] failure to provide adequate support or supervision of the child prior to incarceration also constitutes wanton disregard for the child's welfare. [Father] failed to make himself available to participate in [the Child's] medical care or complete the training needed to care for [the Child].

We agree with the trial court's conclusion that clear and convincing evidence established that Father's actions prior to incarceration constituted a wanton disregard for the Child's welfare.

The trial court found that Father became incarcerated on May 17, 2016, which was within four months of DCS's filing of the petition on August 4, 2016. Shortly after the Child was born, Father was arrested for aggravated burglary on August 17, 2015, and was subsequently released on bond on August 28, 2015. Father testified that he was again arrested on that charge on May 17, 2016, and he remained incarcerated at the time of trial. Father ultimately pled guilty on September 14, 2016, to aggravated burglary and received a sentence of three years' incarceration. On appeal, Father contends that his actions did not constitute wanton disregard for the Child because DCS had failed to establish that he had knowledge of the Child's existence when he committed the crime. We disagree with Father's contention.

It is well settled that the statutory ground of wanton disregard has not been restricted to a parent's actions that occurred during the four months prior to incarceration. *See In re Audrey S.*, 182 S.W.3d at 871. Furthermore, this Court has previously determined that a parent's conduct during pregnancy may be sufficient to establish that a parent's conduct constitutes a wanton disregard for the child's welfare if the parent is aware of the pregnancy. *See In re Jeremiah H.*, No. E2016-00371-COA-R3-PT, 2017 WL 165561, at *5-6 (Tenn. Ct. App. May 2, 2017) ("The actions taken by the parent during the period of pregnancy may be considered in considering this ground of abandonment.") (internal citation omitted); *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015) ("In the context of 'wanton disregard for the welfare of the child,' our courts have extended the definition of 'child' to include the period of pregnancy."). However, the parent must have knowledge of the pregnancy for his or her actions to constitute a wanton disregard for the child's welfare. *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015) ("[W]hile the statutory reference to "the child" can mean a

child *in utero,* the wanton disregard language of Tenn. Code Ann. § 36-1-102(1)(A)(iv) must be construed to require that the father has knowledge of the child at the time his actions constituting wanton disregard are taken."); *see In re M.E.T.*, W2016-00682-COA-R3-PT, 2016 WL 6962306, at *4 (Tenn. Ct. App. Nov. 29, 2016).

The Child was born in July 2015. Father argues on appeal that his criminal conduct occurred prior to the Child's birth and that DCS "never established that [Father] even knew that [Mother] was pregnant with his child, in the months leading up to the child's birth . . . ." Contrary to his current contention, Father testified at trial that he was aware of Mother's pregnancy when she was three or four months pregnant. We note that the record contains conflicting information concerning when Father's crime was committed. Father testified during trial that the aggravated burglary occurred in August 2015, but the criminal indictments regarding the incident reflect that the crime occurred on April 4, 2015. Father's testimony that he learned of Mother's pregnancy at three or four months establishes that he was aware of the Child's existence when he committed aggravated burglary regardless of whether Father's crime occurred in April or August of 2015.

Furthermore, the record contains a dearth of evidence of any attempts by Father to contact the Child, visit the Child, develop a relationship with the Child, or inquire about her well-being following Father's release from jail in August 2015 until his incarceration in May 2016. DCS also presented proof that Father never financially supported the Child. As this Court has elucidated, "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.,* 182 S.W.3d at 867-68. We conclude that the evidence regarding Father's behavior prior to his incarceration supports the trial court's finding that the statutory ground of abandonment through wanton disregard was proven by clear and convincing evidence.

## VII. Best Interest of the Child

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *See In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("'The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination.'") (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010)). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a

child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Although Father has not appealed the trial court's determination that it was in the Child's best interest to terminate his parental rights, we have considered the issue because of its importance. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Arteria H.*, 326 S.W.3d 167, 184 (Tenn. Ct. App. 2010), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015). Following our thorough review of the record and having considered all the factors listed within Tennessee Code Annotated § 36-1-113(i), we conclude that the record contains clear and convincing evidence to support the trial court's determination regarding the Child's best interest. We therefore affirm the trial court's termination of Father's parental rights.

## VIII. Conclusion

For the reasons stated above, we affirm the trial court's judgment. The case is remanded to the trial court, pursuant to applicable law, for enforcement of the judgment terminating Father's parental rights to the Child and collection of costs assessed below. Costs on appeal are assessed against the appellant, Clyde J.

_____
THOMAS R. FRIERSON, II, JUDGE